UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ACF RENEWABLE ENERGY LIMITED,

              Plaintiff,

v.

THE REPUBLIC OF BULGARIA,

              Defendant.

Civil Action No. _____

# COMPLAINT

Plaintiff ACF Renewable Energy Limited ("ACF"), by and through its undersigned counsel, alleges as follows for its Complaint against Defendant the Republic of Bulgaria ("Bulgaria"):

## Nature of the Action

1. This is an action to recognize and enforce an arbitral award issued on January 5, 2024 in ICSID Case No. ARB/18/1 in favor of ACF and against Bulgaria (the "ICSID Award").[1] The ICSID Award was issued by an arbitral tribunal (the "Tribunal") following arbitration proceedings conducted in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention").[2] Pursuant to Article 54 of the ICSID Convention and 22 U.S.C. § 1650a, ACF requests that this Court (1) enter an order recognizing and enforcing the ICSID Award and giving it the same full faith and credit as if it were a final judgment of a court of general jurisdiction of one of the several states, (2) enter judgment in ACF's favor and against Bulgaria in the amounts and currency denominations

---

[1] A true and correct copy of the ICSID Award, certified by the Secretary-General of ICSID, is attached hereto as Exhibit A.
[2] A true and correct copy of the ICSID Convention is attached hereto as Exhibit B.

specified in the ICSID Award, and (3) grant any other and further relief that the Court may deem appropriate.

## The Parties

2. Plaintiff ACF is a company incorporated under the laws of the Republic of Malta, having its principal place of business at Vincenti Buildings, 28/19 (Suite 1174) Strait Street, Valletta VLT 1432, Malta.

3. Defendant Bulgaria is a foreign state within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391(f), and 1602-1611.

## Jurisdiction and Venue

4. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1330(a) and 22 U.S.C. § 1650a(b). This case falls within the exceptions to foreign sovereign immunity set forth in: (i) 28 U.S.C. § 1605(a)(1) for cases in which a foreign state has waived its immunity either explicitly or by implication; and (ii) 28 U.S.C. § 1605(a)(6) for cases brought against a foreign state to confirm an arbitration award that "is or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards."

5. Personal jurisdiction over Bulgaria exists under 28 U.S.C. § 1330(b), which provides that this Court may exercise personal jurisdiction over a foreign state as to every claim for relief over which the Court has subject matter jurisdiction, provided that service has been made in accordance with 28 U.S.C. § 1608.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(f)(4).

**Factual Background**

I.     **SUMMARY OF THE DISPUTE UNDERLYING THE ICSID AWARD**

7.     As discussed further below, under 22 U.S.C. § 1650a(a), the ICSID Award is entitled to receive "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." Consequently, the merits of the dispute and the reasons underlying the Tribunal's resolution of the dispute are not relevant to the recognition and enforcement of the ICSID Award under U.S. law. Nonetheless, solely for the purpose of providing background and context, ACF will briefly summarize the dispute and the ICSID Award.

8.     The dispute underlying the ICSID Award arose out of Bulgaria's violations of the Energy Charter Treaty (the "ECT")[3] with respect to ACF's investment in a photovoltaic facility located in Karadzhalovo village within the municipality of Parvomay (the "Karad Plant").[4]

9.     On May 3, 2011, Bulgaria enacted the Bulgarian Energy from Renewable Sources Act of 2011 (SG No. 35/2011) (the "ERSA") in order to incentivize investments in the country's renewable energy sector.[5] The ERSA guaranteed renewable energy producers a fixed feed-in tariff ("FiT") rate for a period of 20 years, which would apply to the offtake of all electricity produced by each renewable energy plant.[6] The FiT rate for a new plant was fixed at the time when the plant met the program's eligibility criteria (*i.e.*, commencement of production), and the ERSA critically guaranteed that once a FiT rate was applied to a particular plant, the rate would remain stabilized for 20 years.[7]

---

[3] A true and correct copy of the ECT is attached hereto as Exhibit C.
[4] Ex. A, ¶ 90.
[5] Ex. A, ¶ 1241.
[6] Ex. A, ¶¶ 1246-1247.
[7] Ex. A, ¶¶ 1246, 1558.

3

10. On June 20, 2011, the Bulgarian Energy and Water Regulatory Commission ("EWRC") issued a decision that set the FiT rate for plants commencing production between July 2011 to June 2012 (the "FiT Decision") at 485.60 Bulgarian lev ("BGN") per megawatt-hour ("MWh").[8] The FiT Decision and corresponding FiT rate would apply to the Karad Plant provided that construction was completed and production commenced by June 2012.

11. Between September 10, 2011 and March 10, 2012, ACWA Power CF Karad PV Park EAD ("ACWA Bulgaria"), a Bulgarian project company, constructed the Karad Plant.[9]

12. On April 26, 2012, the EWRC issued a license to ACWA Bulgaria for electricity production at the Karad Plant (the "License").[10]

13. On June 11, 2012, the EWRC granted a permit to ACWA Bulgaria to begin electricity production in accordance with the terms of the License.[11]

14. On June 13, 2012, ACWA Bulgaria entered into a power-purchasing agreement ("PPA") with Nationalna Elektricheska Kompania EAD ("NEK"), a Bulgarian State-owned electricity company, to sell 100% of its electricity production to NEK at a fixed FiT rate of BGN 485.60/MWh in accordance with the FiT Decision.[12]

15. On June 28, 2012, ACF bought ACWA Bulgaria from SunE Solar B.V. for the price of EUR 32,458,659 pursuant to a share purchase agreement.[13] By that time, the Karad Plant was fully operational and had received all necessary licenses from Bulgarian Authorities, and thus the

---

[8] Ex. A, ¶ 1266.
[9] Ex. A, ¶ 1218.
[10] Ex. A, ¶¶ 1221, 1274.
[11] Ex. A, ¶¶ 1222, 1277.
[12] Ex. A, ¶¶ 1223, 1231.
[13] Ex. A, ¶¶ 1214-15.

4

FiT rate applicable to all of its electricity production was fixed at the rate of BGN 485.60/MWh for a period of 20 years.[14]

16. Mere weeks later, Bulgaria began introducing a series of seven measures that upended the government's incentive scheme for photovoltaic plants (the "Seven Measures").

17. *First*, on July 17, 2012, Bulgaria amended the Bulgarian Energy Act of 2003 (SG No. 107/2003) (the "Energy Act") to impose a new "grid access fee" on producers of renewable energy.[15] On September 14, 2012, the EWRC issued a decision setting a supposedly "temporary" grid access fee for the Karad Plant at BGN 189.38/MWh, or 39% of the FiT applicable to the Plant (the "Temporary Grid Access Fee").[16]

18. *Second*, on March 13, 2014, Bulgaria again tried to impose a grid access fee on the Karad Plant. This time, the EWRC issued a decision imposing a permanent grid access fee that ranged from BGN 2.45/MWh (for the period of 2014 to 2015) to 5.14/MWh (for the period of 2019 to 2020), or 0.5% to 1.4% of the FiT applicable to the Karad Plant (the "Permanent Grid Access Fee").[17]

19. *Third*, on January 1, 2014, Bulgaria amended the ERSA to impose an annual cap on the quantity of electricity produced by renewable energy plants, including the Karad Plant, that was eligible to receive the FiT (the "Annual Production Cap").[18]

20. *Fourth*, also on January 1, 2014, Bulgaria amended the ERSA to impose an electricity production fee on wind and solar energy producers equal to 20% of the applicable FiT (the "20% Levy").[19]

---

[14] Ex. A, ¶ 98.
[15] Ex. A, ¶ 1370.
[16] Ex. A, ¶¶ 1371-1372.
[17] Ex. A, ¶¶ 1379-1380, 1382.
[18] Ex. A, ¶¶ 1385-1386.
[19] Ex. A, ¶ 1403.

5

21.     *Fifth*, on May 9, 2014, Bulgaria amended the Electricity Market Rules (SG No. 66/2013) to require renewable energy producers to pay greater "balancing" costs, which are the costs of balancing out the effect that a higher or lower than forecast production of electricity has on the overall electricity grid by requiring the decrease or increase of the input of other sources of electricity at a cost (the "Balancing Cost Exposure").[20]

22.     *Sixth*, in 2015, Bulgaria amended the Energy Act to require renewable energy producers to contribute 5% of their FiT revenue to the Security of Electrical Power System Fund ("ESSF") on a monthly basis (the "5% ESSF Contribution").[21]

23.     *Seventh*, on May 8, 2018, Bulgaria amended the Energy Act to replace the FiT scheme with a feed-in premium ("FiP") scheme (the "Transition from FiT to FiP"). Under the FiP scheme, renewable energy producers would sell their electricity on the wholesale market and receive a premium from the State equal to the difference between the estimated wholesale price and the original FiT.[22] The FiP was calculated annually based on the "forecast market price of electricity" and set by the EWRC.[23]

24.     The Seven Measures, individually and collectively, greatly diminished the value of and return on ACF's investment in ACWA Bulgaria and the Karad Plant. On December 14, 2019, ACF sold its shares in ACWA Bulgaria for *less* than what it paid to purchase ACWA Bulgaria seven years prior.[24] ACF's damages expert opined in the arbitration that the Seven Measures in combination reduced the value of ACF's investment by € 78.1 million.[25]

---

[20] Ex. A, ¶¶ 1413, 1417.
[21] Ex. A, ¶¶ 1418, 1422.
[22] Ex. A, ¶ 1425.
[23] Ex. A, ¶¶ 1426-1427.
[24] Ex. A, ¶ 1216.
[25] Ex. A, ¶¶ 629-30.

## II. THE TREATY

25. Both the relationship and the dispute between ACF and Bulgaria are governed by the ECT, which Bulgaria signed on December 17, 1994 and ratified on July 31, 1996.[26] The ECT entered into force in Bulgaria on April 16, 1998.[27] Malta signed the ECT on December 17, 1994, and the ECT entered into force in Malta on August 28, 2001.[28]

26. The ECT obligates each Contracting Party to protect Investments made by Investors of the other Contracting Parties within its territory. Article 1(7) provides that the term "Investor" means, with respect to a Contracting Party, "a company or other organization organized in accordance with the law applicable in that Contracting Party."[29]

27. Article 1(6) of the ECT defines the term "Investment" broadly to include "every kind of asset, owned or controlled directly or indirectly by an Investor," including: "tangible and intangible, and immovable property and any property rights such as leases, mortgages, liens, and pledges," and "any right conferred by law or contract or by virtue of any licenses or permits granted pursuant to law to undertake any Economic Activity in the Energy Sector."[30] In the arbitration, Bulgaria did not dispute that ACF's investment in ACWA Bulgaria and its Karad Plant constituted covered "Investments" under the ECT.[31]

28. The ECT sets out the substantive obligations of each Contracting Party to protect Investors of the other Contracting Parties and their Investments. For example, Article 10(1) provides:

---

[26] Energy Charter Secretariat: Bulgaria, *available at* https://www.energycharter.org/who-we-are/members-observers/countries/bulgaria/ (last updated July 31, 2015).
[27] Energy Charter Secretariat: Bulgaria, *available at* https://www.energycharter.org/who-we-are/members-observers/countries/bulgaria/ (last updated July 31, 2015).
[28] Energy Charter Secretariat: Malta, *available at* https://www.energycharter.org/who-we-are/members-observers/countries/malta/ (last updated July 31, 2015).
[29] Ex. C, Article 1(7).
[30] Ex. C, Article 1(6).
[31] *See generally* Ex. A, §§ III.B and V.B.

## II. THE TREATY

25. Both the relationship and the dispute between ACF and Bulgaria are governed by the ECT, which Bulgaria signed on December 17, 1994 and ratified on July 31, 1996.[26] The ECT entered into force in Bulgaria on April 16, 1998.[27] Malta signed the ECT on December 17, 1994, and the ECT entered into force in Malta on August 28, 2001.[28]

26. The ECT obligates each Contracting Party to protect Investments made by Investors of the other Contracting Parties within its territory. Article 1(7) provides that the term "Investor" means, with respect to a Contracting Party, "a company or other organization organized in accordance with the law applicable in that Contracting Party."[29]

27. Article 1(6) of the ECT defines the term "Investment" broadly to include "every kind of asset, owned or controlled directly or indirectly by an Investor," including: "tangible and intangible, and immovable property and any property rights such as leases, mortgages, liens, and pledges," and "any right conferred by law or contract or by virtue of any licenses or permits granted pursuant to law to undertake any Economic Activity in the Energy Sector."[30] In the arbitration, Bulgaria did not dispute that ACF's investment in ACWA Bulgaria and its Karad Plant constituted covered "Investments" under the ECT.[31]

28. The ECT sets out the substantive obligations of each Contracting Party to protect Investors of the other Contracting Parties and their Investments. For example, Article 10(1) provides:

---

[26] Energy Charter Secretariat: Bulgaria, *available at* https://www.energycharter.org/who-we-are/members-observers/countries/bulgaria/ (last updated July 31, 2015).
[27] Energy Charter Secretariat: Bulgaria, *available at* https://www.energycharter.org/who-we-are/members-observers/countries/bulgaria/ (last updated July 31, 2015).
[28] Energy Charter Secretariat: Malta, *available at* https://www.energycharter.org/who-we-are/members-observers/countries/malta/ (last updated July 31, 2015).
[29] Ex. C, Article 1(7).
[30] Ex. C, Article 1(6).
[31] *See generally* Ex. A, §§ III.B and V.B.

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.[32]

### III.   THE PARTIES' AGREEMENT TO ARBITRATE

29.   Article 26(4) of the ECT, which memorializes Bulgaria's consent to arbitration of claims brought against it by an Investor of another Contracting Party, provides that:

> In the event that an Investor chooses to submit the dispute . . . [to international arbitration], the Investor shall further provide its consent in writing for the dispute to be submitted to:
>
> (a)(i) The International Centre for Settlement of Investment Disputes . . . if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention . . . .[33]

30.   ACF affirmed in writing its consent to submission of the Parties' dispute to ICSID arbitration in its Request for Arbitration, which it submitted to ICSID on February 7, 2018.[34]

31.   Bulgaria gave its "unconditional consent" to the submission of the dispute to ICSID arbitration in Article 26(3)(a) of the ECT, which provides that "subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this

---

[32] Ex. C, Article 10(1).
[33] Ex. C, Article 26(4).
[34] A true and correct copy of the Request for Arbitration is attached hereto as Exhibit D.

Article."[35]

32. Accordingly, under Article 26 of the ECT, ACF's submission of the Parties' dispute to ICSID arbitration coupled with Bulgaria's consent set forth in Article 26(3)(a) constituted an agreement to arbitrate within the meaning of Chapter II of the ICSID Convention.

## IV. THE ARBITRATION

33. On February 7, 2018, ACF commenced the arbitration by filing and serving a Request for Arbitration on Bulgaria.[36] On February 14, 2018, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.[37]

34. The arbitration proceeded in accordance with the ICSID Convention and ICSID Arbitration Rules.[38] The selection of the Tribunal was completed on June 1, 2018.[39] The Tribunal selected by the Parties consisted of Judge Bruno Simma (President), Mr. Oscar M. Garibaldi (appointed by ACF), and Prof. Pierre Mayer (appointed by Bulgaria).[40]

35. Bulgaria was represented in the arbitration by external counsel at the international law firm White & Case.[41] Bulgaria fully participated in the arbitration, including submitting a Request for Bifurcation, Submission in Support of a Separate Preliminary Objections Phase, Memorial on the Preliminary Jurisdictional Objection, Reply on the Preliminary Jurisdictional Objection, a Counter-Memorial on the Merits and Objections to Jurisdiction, and a Rejoinder on

---

[35] Ex. C, Art. 26.
[36] *See* Decision on the *Achmea* Preliminary Objection dated December 20, 2019 (the "**Decision on *Achmea*,**" attached hereto as Exhibit E), ¶ 11.
[37] Ex. E, ¶ 12.
[38] Ex. A, ¶ 1.
[39] Ex. E, ¶ 15.
[40] *Id.*
[41] Ex. A at p. 1, ¶ 71.

9

the Merits and Reply on Jurisdiction.[42]

36. From July 23, 2019 to July 24, 2019, the Tribunal conducted a hearing on jurisdiction, in which both parties participated, presented witnesses and experts for examination, and were represented by their respective counsel.[43] On December 20, 2019, the Tribunal issued its Decision on *Achmea* denying Bulgaria's *intra*-EU jurisdictional objection (discussed below).[44]

37. From June 7, 2021 to June 12, 2021, the Tribunal conducted a hearing on jurisdiction, merits, and quantum, in which both parties participated, presented witnesses and experts for examination, and were represented by their respective counsel.[45]

## V. THE TRIBUNAL'S DECISION DENYING BULGARIA'S *INTRA*-EU JURISDICTIONAL OBJECTION

38. In the arbitration, Bulgaria objected to the Tribunal's jurisdiction on the ground (*inter alia*) that the ECT and the ICSID Convention could not provide jurisdiction over disputes between nationals of one European Union ("EU") Member State and another EU Member State based on the judgment of the Court of Justice of the European Union in *Slovak Republic v. Achmea B.V.*, Case C-284/16.[46] The Tribunal denied Bulgaria's *intra*-EU jurisdictional objection in its December 20, 2019 Decision on the *Achmea* Preliminary Objection.[47]

39. On September 13, 2021, Bulgaria requested leave from the Tribunal to submit into the record the judgment of the Court of Justice of the European Union in *Republic of Moldova v. Komstroy LLC*, Case C-741/19, and requested that the Tribunal revisit its December 20, 2019 Decision on the *Achmea* Preliminary Objection in light of *Komstroy* (the "*Komstroy* Objection").[48]

---

[42] *See generally* Ex. A, § II.B and Ex. E, § II.
[43] Ex. E, ¶ 50.
[44] Ex. E, ¶ 236.
[45] Ex. A, ¶¶ 71-72.
[46] Ex. E, ¶ 6.
[47] Ex. E, ¶ 236.
[48] Ex. A, ¶¶ 78, 449.

10

The Tribunal granted Bulgaria's request and, on October 4, 2021, instructed the Parties to submit briefing on *Komstroy*.[49]

## VI. THE ICSID AWARD

40. The Tribunal issued the ICSID Award on January 5, 2024. The ICSID Award was unanimous.

41. Regarding jurisdiction, the ICSID Award rejected all of Bulgaria's objections and upheld the Tribunal's jurisdiction, with one exception. First, the ICSID Award rejected Bulgaria's renewed "*intra*-EU" objection on the basis that the Tribunal already had adjudicated and rejected that objection in the Decision on *Achmea* and that the *Komstroy* decision did not change its conclusion.[50] Second, the ICSID Award rejected Bulgaria's objection that it had denied the benefits of the ECT to ACF pursuant to Article 17 of the ECT.[51] Third, the ICSID Award rejected Bulgaria's objection that the 20% Levy was a taxation measure that fell outside of the Tribunal's jurisdiction under Article 21 of the ECT.[52] Lastly, however, the ICSID Award upheld Bulgaria's objection that the 5% ESSF Contribution was a taxation measure that fell outside of the Tribunal's jurisdiction under Article 21 of the ECT.[53]

42. Regarding the merits of the claims over which the Tribunal had jurisdiction, the ICSID Award held that Bulgaria breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to ACF's investment in the Karad Plant, in two respects. First, the Tribunal found that Bulgaria violated ACF's legitimate expectations that Bulgaria would guarantee "(i) a fixed price over (ii) a fixed time (iii) for all energy produced," so long as ACF satisfied the

---

[49] Ex. A, ¶ 80
[50] Ex. A, ¶¶ 1512-1515.
[51] Ex. A, ¶¶ 1457-1481.
[52] Ex. A, ¶¶ 1496-99.
[53] Ex. A, ¶¶ 1500-11.

conditions set forth in the State's renewable energy legal framework (which it did), by imposing the Annual Production Cap, 20% Levy, and Transition from FiT to FiP.[54] Second, the Tribunal found that the Permanent Grid Access Fee "constitute[d] a significant change" in Bulgaria's approach to grid-access costs, was "*de facto* a reduction" of the FiT, "applied only to renewable energy producers that sell their production at a FiT and not to renewable energy producers that sell on the open market" (and thus "was more related to a renewable energy producer receiving a FiT rather than to a renewable energy producer accessing the electricity grid"), was structured to achieve a "*de facto* retroactive application," and granted Bulgaria a "double recovery" from ACF, because the Karad Plant paid twice for the retroactive application of the Permanent Grid Access Fee.[55]

43. In the alternative to its claim that Bulgaria breached the fair and equitable treatment obligation, ACF also claimed that Bulgaria breached Article 10(1) of the ECT because (i) the Seven Measures constituted unreasonable and discriminatory measures that impaired ACF's investment and (ii) Bulgaria had failed to "observe any obligations" it had entered into with ACF.[56] Having found that Bulgaria breached its fair and equitable treatment obligations by promulgating the Annual Production Cap, 20% Levy, Permanent Grid Access Fee, and Transition from FiT to FiP, the Tribunal only assessed these alternative legal claims with respect to the Temporary Grid Access Fee and Balancing Cost Exposure.[57] The ICSID Award concluded that these two measures were not unreasonable or discriminatory[58] and did not violate Bulgaria's obligation to "observe any obligations" it had entered into with ACF.[59]

---

[54] Ex. A, ¶¶ 1660, 1697-1698, 1717.
[55] Ex. A, ¶¶ 1750-1757.
[56] *See generally*, Ex. A § III.A.20.b and c.
[57] Ex. A, ¶¶ 1776, 1783.
[58] Ex. A, ¶¶ 1777-1781.
[59] Ex. A, ¶¶ 1784-88.

44. Regarding the quantum of compensation, the ICSID Award largely accepted the damages valuation put forward by ACF's expert, noting that Bulgaria had opposed that valuation "only on the basis of principle and legal standard, not on the basis of alleged incorrectness of the calculation itself."[60] After deducting amounts attributable to the claims over which the Tribunal had no jurisdiction or found no liability, the ICSID Award ordered Bulgaria to pay compensation in the principal amount of EUR 61,040,000, plus compound interest on that amount and a portion of ACF's costs to prosecute the arbitration.[61]

45. In the "operative part" of the ICISD Award, the Tribunal ordered Bulgaria to pay compensation to ACF in the following amounts:[62]

   a. Compensation in the amount of EUR 61,040,000;[63]

   b. Pre-Award interest on the amount of EUR 61,040,000 running from December 31, 2019 until the date of the Award (January 5, 2024) at the rate of "12m EURIBOR +2% as valid on 31 December 2019, to be compounded annually";[64]

   c. Post-Award interest "over the awarded amount plus pre-award interest running from the date of the Award at the rate of 12m EURIBOR plus 2% as valid on the date of the Award, to be compounded annually";

   d. ACF's legal costs incurred in connection with the arbitration in the amount of EUR 264,833.90 and USD 5,209,865.05;[65] and

---

[60] Ex. A, § V.D and ¶ 1807.
[61] Ex. A, ¶¶ 1809-10, 1812-14, and 1841-42.
[62] Ex. A, ¶ 1843.
[63] Ex. A, ¶ 1843(a).
[64] Ex. A, ¶¶ 1843(e)-(f).
[65] Ex. A, ¶¶ 1843(h).

e. ACF's share of the Tribunal's and ICSID's fees in the amount of USD 480,766.49.[66]

## VII. BULGARIA'S FAILURE TO SATISFY THE ICSID AWARD

46. By letter dated February 12, 2024, ACF demanded Bulgaria's immediate payment of the sums due under the ICSID Award. As of the date of ACF's letter, the total amount due under the ICSID Award was EUR 71,444,255,80, with interest continuing to accrue at a rate of EUR 10,161.40 per day.

47. Bulgaria has not responded to ACF's letter of February 12, 2024, and the Award remains unpaid to date.

48. Bulgaria did not request annulment of the ICSID Award under the ICSID Convention. The deadline for Bulgaria to request annulment was May 4, 2024 (120 days after the date on which the ICSID Award was rendered).

**Cause of Action – Recognition of the ICSID Award Pursuant to 22 U.S.C. § 1650a**

49. ACF repeats and realleges the allegations in paragraphs 1 through 48 as if set forth fully herein.

50. On August 27, 1965, the United States signed the ICSID Convention, which establishes a framework for the resolution of investment disputes between a foreign sovereign party to the Convention and a national of another State party to the Convention.[67] The United States deposited its instrument of ratification for the ICSID Convention on June 10, 1966, and the Convention entered into force for the United States on October 14, 1966.[68] Awards issued pursuant to the ICSID Convention are subject to recognition and enforcement in the United States under

---

[66] Ex. A, ¶¶ 1843(i).
[67] Database of ICSID Member States, *available at* https://icsid.worldbank.org/about/member-states/database-of-member-states (last visited May 22, 2024).
[68] *Id*.

Article 54 of the ICSID Convention and pursuant to 22 U.S.C. § 1650a.

51. Bulgaria signed the ICSID Convention on March 21, 2000, and deposited its ratification on April 13, 2001.[69] The ICSID Convention entered into force for Bulgaria on May 13, 2001. As discussed above, ACF is a national of Malta,[70] which became a Contracting State to the ICSID Convention on December 3, 2003.[71]

52. Article 53(1) of the ICSID Convention provides that an award rendered by an ICSID tribunal "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."[72] There is no stay of enforcement currently in place. Thus, pursuant to Article 53 of the ICSID Convention, Bulgaria is obligated to abide by and comply with the terms of the ICSID Award without any further action by ACF.

53. Article 54(1) of the ICSID Convention provides that "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."[73]

54. Section 1650a(a) of Title 22 of the United States Code implements Article 54 of the ICSID Convention by providing as follows:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and

---

[69] *Id.*
[70] Ex. A, ¶ 2.
[71] Database of ICSID Member States, *available at* https://icsid.worldbank.org/about/member-states/database-of-member-states (last visited May 22, 2024).
[72] Ex. B, Article 53(1).
[73] Ex. B, Article 54(1).

credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

55. The ICSID Award was rendered by an arbitral tribunal pursuant to Chapter IV of the ICSID Convention.

56. The ICSID Award includes pecuniary obligations in the amounts set out in paragraph 45 above. Bulgaria has not satisfied any part of these outstanding pecuniary obligations.

57. Pursuant to 22 U.S.C. § 1650a(a) and Article 54 of the ICSID Convention, the ICSID Award must be recognized and the pecuniary obligations therein must be enforced "as if the award were a final judgment of a court of general jurisdiction of one of the several States."[74]

## **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

(a) Recognizing the ICSID Award and enforcing the pecuniary obligations imposed by the ICSID Award as if the ICSID Award were a final judgment of a court of general jurisdiction of one of the several States;

(b) Entering judgment in ACF's favor and against Bulgaria in the amounts and currency denominations specified in the ICSID Award, including the principal amount of EUR 61,040,000, legal costs of EUR 264,833.90 and USD 5,209,865.05, arbitration costs of USD 480,766.49, and pre-award and post-award interest as ordered by the Tribunal; and

(c) Awarding such other and further relief as may be proper.

---

[74] 22 U.S.C. § 1650a(a).

Dated: New York, New York
June 13, 2024

Respectfully submitted,

 /s/ *Thomas C.C. Childs*
Thomas C.C. Childs (NY0449)
Camilla Akbari (*pro hac vice* forthcoming)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: (212) 556-2200
Fax: (212) 556-2222
tchilds@kslaw.com
cakbari@kslaw.com

*Attorneys for Plaintiff ACF Renewable Energy Limited.*